# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 59937-6-II |
| L.C., | UNPUBLISHED OPINION |
| Appellant. | |

CHE, J.—LC appeals the superior court's denial of his motion to revise its 14-day involuntary treatment order.

LC was admitted to a hospital after he received a traumatic brain injury (TBI). LC was diagnosed with persistent encephalopathy, substance use disorder, alcohol use disorder, and cognitive impairment related to a major neurocognitive disorder due to his TBI.

After hospital staff medically cleared LC, hospital staff referred LC for an evaluation under Washington State's involuntary treatment act (ITA). After the evaluation, the designated crisis responder (DCR) did not detain LC. However, when LC thereafter attempted to leave the hospital, hospital staff restrained him from leaving due to severe cognitive impairment. LC's impairment made it unsafe to discharge him because it would put his life in danger. Over the next month-and-a-half, LC attempted to leave the hospital on average two to three times per week, but hospital staff physically and chemically restrained LC.

Eventually, hospital staff referred LC for another ITA evaluation. After this second evaluation, the DCR concluded that LC met the ITA's criteria for detainment. Hospital staff then petitioned for 14-day of involuntary treatment. At a hearing on the petition, LC moved to

dismiss the petition, alleging that the hospital totally disregarded the ITA by restricting him from leaving after the first DCR evaluation. A superior court commissioner denied LC's motion to dismiss.

The commissioner granted the petition for 14-day involuntary treatment, finding that LC met the definition of "gravely disabled" under both prongs. The superior court denied LC's motion to revise the involuntary treatment order.

LC argues that the superior court erred in denying his motion to dismiss the petition. LC also argues that the written findings are insufficient to permit meaningful appellate review and that there was insufficient evidence to find that LC was gravely disabled.

We hold that the superior court did not err in denying LC's motion to dismiss, the written findings were sufficient to permit review, and substantial evidence supported the superior court's finding that LC was gravely disabled. Accordingly, we affirm the superior court's denial of LC's motion to revise the 14-day involuntary treatment order.

FACTS

I. BACKGROUND

In early April 2024, LC, an adult, was admitted to St. Joseph Medical Center after multiple people assaulted him. The assault caused a TBI. Once LC became alert, the hospital provided LC with treatment, including physical therapy and occupational therapy, and connected LC with psychologists, psychiatrists, and a social worker.

Early on in LC's hospital stay, "when [LC] was traumatized and unable to make decisions on his own behalf," the hospital designated LC's sister as his surrogate decision-maker. Rep. of Proc. (RP) at 34-35. The designation of a surrogate decision-maker occurred through a

2

hospital process, not a legal action, and allowed a person to make medical decisions for "non-decisional" patients. RP at 36.

On May 17, the hospital medically cleared LC. Five days later, a DCR evaluated LC after the hospital's referral. LC was not detained following the DCR's evaluation.

Because of LC's "poor capacity and poor decision-making ability, the medical team, psychiatrist -- again, in consultation with family -- made the determination that . . . it's not safe for him to discharge and, therefore, he cannot leave against medical advice." RP at 26-27. Hospital staff kept him at the hospital "because of [LC's] severe cognitive impairment, that he was not safe to discharge, [and] that doing so would put his life in harm's way." RP at 25-26. LC's sister agreed with the hospital that letting LC leave was not in his best interest and that LC should remain in the hospital until "the DCRs take him" or placement was found. RP at 35.

LC remained at the hospital for the next month-and-a-half. During this time, LC attempted to leave the hospital on an average of two to three times a week. Hospital staff chemically and physically restrained LC during some of his attempts to leave.

Hospital staff prescribed anti-psychotic medication to LC to help reduce LC's impulsivity and aggression. LC was prescribed an oral medication under a two-doctor order to compel. If LC refused to take that medication, he would receive an injectable one.

On July 2, following "elopements and assaults," hospital staff made a second DCR referral. RP at 7. Hospital staff shared that LC had become increasingly aggressive and agitated, requiring four-to-five-point restraints every couple of hours. LC also believed falsely that LC's family member was on another floor waiting to take him home. Hospital staff reported that LC had made multiple attempts to leave the hospital and had become "more verbally and physically

3

aggressive towards staff in order to do so." Clerk's Papers (CP) at 3. According to hospital staff, LC was receiving "mental health medications," but the medications were not helping. CP at 2. Additionally, a social worker shared that LC could not do activities of daily living without support and LC could not explain how he would meet his daily needs.

On July 2, the DCR accepted the referral and took LC into emergency custody under the ITA. On July 8, a physician and mental health professional with the hospital petitioned the superior court for a 14-day involuntary treatment order for LC.

## II. PROBABLE CAUSE HEARING

A commissioner with the superior court held a probable cause hearing on the 14-day involuntary treatment petition.

### A.    *Baker's Testimony*

The State presented the testimony of Marschell Baker, a mental health professional who examined LC.

According to Baker, LC's TBI "changed him forever." RP at 10. LC was diagnosed with persistent encephalopathy, a substance use disorder per his history,[1] alcohol use disorder, and cognitive impairment related to a major neurocognitive disorder due to his TBI. LC's neurocognitive disorder mirrored severe dementia, but LC's condition was not expected to deteriorate at the same rate as dementia or Alzheimer's. LC's symptoms could heal over time; however, Baker did not know whether the improvements would be significant: "At best, [LC's

---

[1] Even though LC had a history of a substance use disorder, LC did not appear to have prior contact with the mental health system.

neurocognitive challenges] would maybe move up to moderate but that would not change the fact that [LC] would need support to manage in the community." RP at 30.

Since being admitted to the hospital, LC exhibited aggression episodically and was unable to be redirected at times. During Baker's evaluations of LC and her review of collateral information, LC appeared disheveled at times, including days before the probable cause hearing. However, Baker never observed LC "malodorous at all. He's just been a little unkempt at times." RP at 8. More recently, LC appeared clean and well-groomed, which Baker attributed to family members visiting and helping LC with grooming.

At times when Baker saw LC, LC neither acknowledged Baker's presence nor responded to Bakers' engagement attempts. One day, a physical therapy provider tried to work with LC and, even though the therapist was touching LC, LC gave no acknowledgement of the provider's touch. Recently, Baker observed LC being conversational, but he could only communicate in one- or two-word responses and in a concrete way. LC appeared "very in the here and now; he [was] not able to abstract." RP at 11.

LC's responses in conversations were "somewhat slow" and, when LC appeared quiet and monotone, it would take him some time to process conversations. RP at 10. Baker noted that a review of his record indicated that, at times, LC could string together expletives and yell at people, but Baker never observed him behaving in that way.

According to Baker, LC's perceptions of reality and of his environment were impaired. Baker recalled an incident the night prior to the hearing where LC wanted to go to a store to buy a cell phone because he wanted to call his sister, but LC was unable to recognize that he was hospitalized and his room already contained a phone on which he could call his sister. During

this incident, LC "puffed up" and said, "Get out of the way, bitch." RP at 13. LC walked out of his room and towards the elevators. Staff were able to eventually redirect LC, calm him down, and help him back to his room.

In a conversation with Baker, LC thought he was in Seattle as opposed to Tacoma and thought it was January as opposed to sometime in the summer. On "good days," LC would indicate that he knew he was in the hospital due to being assaulted, but LC did not remember why he was still in the hospital. With family members, LC would episodically recall memories from the past, but hospital staff were not later able to duplicate his recollection of the memories.

In assessing LC's judgment and insight, Baker believed that LC did not understand his behaviors and that LC did not appear to grasp that he would put himself and others at risk at times. Baker also believed LC did not understand that he would need some level of care or assistance for the remainder of his life.

In assessing LC's cognitive and volitional control, Baker concluded that, while LC's recall was "fair at times":

> he has got very poor executive functioning and problem-solving skills. His working memory is poor and he has difficulty organizing his thoughts.
> He continues to make attempts -- in terms of volitional control, he continues to make attempts to leave, despite being told time and time again, you know, you are at the hospital and you can't leave, that it is not safe for you out in the world just yet, we need to get some support for you. And, at times, you know, threatening and posturing folks that, you know -- that are worried that he may be assaultive.

RP at 12-13. At times, staff called "code greys" so security could standby and assist. RP at 14. "Code greys" were "the staff's way of saying [the situation] is out of control, we are concerned for our safety and the safety of others." *Id.*

6

LC also presented with agitation caused by "a whole host of things," with "no rhyme or reason" for the cause of his agitation. RP at 32-33. Hospital staff found they could not help LC manage his agitation due to LC not always being able to communicate the cause of the agitation and there being no clear precipitating event for his agitation. The staff did not know whether LC was agitated because he wanted to do something but could not articulate what he wanted to do, whether LC was too hot, or whether there was some other reason for his agitation.

According to Baker, LC's symptoms were consistent with his behavioral health disorder diagnoses and Baker's agitation symptoms were a result of his major neurocognitive disorder. In Baker's opinion, his behavioral health diagnoses made him gravely disabled. LC lacked insight and judgment to manage his own health, safety, or wellbeing. Additionally, LC lacked the memory to take his medications. LC could be taught to use the skills he currently had but would need assistance to learn how to manage his traumatic brain injuries. For example, LC could be taught a routine and given cards to remember certain facts like what day of the week it was.

Prior to the assault, LC had an apartment; however, the apartment was no longer available to him. LC would have no safe place to go if he were discharged. Baker guessed that, if LC were to leave the hospital:

> he would wander the streets.
>
> I think that in very, very short order -- like, as in hours -- he would be brought back to an emergency room and come under the attention of either police department or the DCRs. I don't think that he would survive outside in this manner. In 3 to 5 hours, he would be back at a hospital.

RP at 20. Baker also worried that, because of LC's impulsivity, LC could inadvertently hurt someone or others could misread and hurt him again. Because there was no place for LC to live

and no services set up to accommodate LC's needs, Baker believed that a less restrictive

treatment was not in LC's best interest at the time.

B.     *LC's Motion to Dismiss*

LC moved to dismiss the petition based on a total disregard of the ITA.  LC argued that,

between the first DCR referral and the second, LC was not gravely disabled, there was no legal

basis to involuntarily hold him, and yet he was physically and mechanically restrained from

leaving the hospital.  LC argued that, if the family wanted to detain LC, they could have pursued

a "Joel's Law" petition[2] or made another referral to a DCR.  According to LC, restraining him

from leaving amounted to a detention without legal authority and in clear disregard of the ITA.

The State responded that, prior to the second DCR referral, LC was not detained under

the ITA and was receiving care for the severe brain injury.  While LC had been medically

cleared, LC also needed ongoing medical treatment that could not occur outside of the hospital.

The State asserted that LC presented no evidence that the surrogate decision-making process was

invalid, illegal, or could not allow the sister to decide that LC would stay and receive treatment

for a medical issue at the hospital.

The commissioner denied LC's motion to dismiss.  The commissioner made no written

ruling, however, in its oral ruling, the commissioner explained:

> This was not an ITA case until they filed their petition; it was a medical case. He
> was held --
>
>       I agree with the State on this one.  He was held for purposes of medical care
> and treatment.  And this was not something where he is trying to leave the hospital,

---

[2] Joel's Law allows a person's immediate family member, guardian, conservator, or fellow Indian Tribe member to petition a superior court for detention of the person for involuntary treatment if a DCR has decided not to detain the person for evaluation and treatment.  *See* RCW 71.05.201.

8

again, against medical advice for behavioral health treatment. This is for medical treatment. And that's the basis for the reason for any delay. The motion has, quite frankly, very little if no merit at all. He is being treated in a hospital for a specific, very severe head injury, traumatic brain injury medical condition. He couldn't even make his own decisions. There needed to be a surrogate medical decision maker because he was either unable or unwilling or had inability to make th[ese] medical decisions. And so I deny the motion to dismiss.

RP at 40.

### III. THE COURT'S RULING

The commissioner presented their findings both written and on the record. In its oral ruling, the commissioner found:

[LC] has got impulsivity, anger, aggressive behaviors. He's severely, cognitively impaired. Those last characterization about there is no delusions, per se, but what I heard Ms. [Baker] say is he is distracted, introverted, doesn't recognize others that are trying to engage with him, or what will happen. And he is not sure why these -- they are not even sure why these things happen. His ability -- reality-based ability is implicated, impaired, impacted by his cognitive abilities. He has -- they can't even pin down what the cause of the agitation was . . . There is just a whole host of things that he becomes agitated about. And I think that was -- it's a symptom of his major neurocognitive disorder.

The medical basis for hospitalization is clearly established. For the hospital to release him would, quite frankly, in this Court's opinion leave them open to potential liability. But on the petition for involuntary treatment, he has got severe cognitive impairment. . . .

He has got poor capacity, poor decision-making ability, poor reality perceptions, and -- again, the medications to calm his behaviors and his agitation, aggression -- he takes them for the most part. There is even a two-doctor order to compel . . . .

Again, there is more than ample evidence to support that he needs to be in a supportive housing. There is grave disability based on his diagnosis. Clearly -- there is a clear nexus between his diagnoses -- multiple diagnoses and his cognitive impact under both prong (a) and prong (b). He can't meet his basic health and safety needs in the community at this point. And even in a hospital setting, that becomes difficult at times based on his agitation and his impulsivity and his other behaviors . . . . Even . . . if this is his baseline -- and we don't know that at all at

this point . . . his baseline may progressively decompensate.  And if it's his baseline at present, he's not doing very well.

RP at 44-46.

In the written findings, the commissioner included the following statement before presenting its findings: "In addition to the findings of fact and conclusions of law written below, the court incorporates by reference the oral findings of fact and conclusions of law."  CP at 21.

The written findings indicated that the commissioner entered its findings of fact under the preponderance of the evidence standard of proof.  Under a heading titled, "Findings of Fact," the commissioner provided two-and-a-half pages characterizing and presenting Baker's testimony during the hearing, consistent with the facts above and its oral ruling.  *Id.*  Included in this narrative, the commissioner also described LC's motion to dismiss, the petitioner's response, and the commissioner's denial of LC's motion.

The commissioner then found "based on the verified Petition and the testimony of Petitioner" that LC was diagnosed with persistent encephalopathy, alcohol use disorder, a substance use disorder, and:

> Chronic subdural hematoma, punctate chronic micro hemorrhages b/1 frontal lobes and parietal lobes. Cognitive impairment[] [Montreal Cognitive Assessment score][3] 6/30, done on 4/30/24 Patient cannot leave AMA. Poor capacity to make decision.

CP at 24-25.  The commissioner then checked two pre-written boxes indicated, "As a result of a behavioral health disorder, [LC] is in danger of serious physical harm resulting from a failure to provide for his . . . essential human needs of health or safety [and] manifests severe deterioration

---

[3] The Montreal Cognitive Assessment is a testing instrument for cognitive dysfunction. According to a later petition for involuntary treatment for LC, "a score of 26 or greater is considered normal."  CP at 53.

in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his . . . actions and is not receiving such care as is essential for his . . . health or safety." CP at 25.

Under a heading titled, "Conclusions of Law," the commissioner checked two more pre-written boxes indicating that they concluded that LC was not a good faith voluntary patient and was gravely disabled. *Id*. The commissioner also checked a box noting that less restrictive alternatives to involuntary detention were not in LC or others' best interests. The commissioner ordered LC to be involuntarily detained for no more than 14 days of involuntary treatment.

LC moved the superior court to revise the 14-day involuntary treatment order. Based on the pleadings of the parties, the superior court denied LC's motion. LC appeals the superior court's order on his motion to revise.

## ANALYSIS[4]

### I. MOTION TO DISMISS

LC argues that the superior court erred in denying his motion to dismiss the petition because the hospital totally disregarded the ITA by lacking any lawful authority to detain LC. We disagree.

---

[4] Although LC is no longer detained under the 14-day involuntary treatment order, his appeal of this order is not moot because his involuntary treatment order may have adverse consequences on future commitment determinations under chapter 71.05 RCW. *See In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012) (published in part). DCRs or professionals conducting evaluations under the chapter must consider prior commitments under chapter 71.05 RCW. RCW 71.05.212(1). Additionally, a court must consider "all available evidence concerning the respondent's historical behavior" when determining if the individual qualifies for commitment under the chapter. RCW 71.05.245(1); *see also* RCW 71.05.012 ("prior history is particularly relevant in determining whether [an involuntarily committed person] would receive, if released, such care as is essential for his or her health or safety.").

A.    *Legal Principles*

The legislature enacted the ITA with the following intentions:

> (a) To protect the health and safety of persons suffering from behavioral health disorders and to protect public safety through use of the parens patriae and police powers of the state;
> (b) To prevent inappropriate, indefinite commitment of persons living with behavioral health disorders and to eliminate legal disabilities that arise from such commitment;
> (c) To provide prompt evaluation and timely and appropriate treatment of persons with serious behavioral health disorders;
> (d) To safeguard individual rights;
> (e) To provide continuity of care for persons with serious behavioral health disorders;
> (f) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures; and
> (g) To encourage, whenever appropriate, that services be provided within the community.

RCW 71.05.010(1); *In re Det. of D.H.*, 1 Wn.3d 764, 772, 780, 533 P.3d 97 (2023).

The ITA allows the State to involuntarily detain a person suffering from a behavioral health disorder for evaluation and treatment. *In re Det. of A.C.*, 1 Wn.3d 731, 735, 533 P.3d 81 (2023). However, due to the important liberty and safety issues implicated, the ITA imposes "highly specific restrictions on the exercise of that power." *Id.* at 735. Accordingly, the ITA is strictly construed. *Id.* at 741.

In construing the ITA's requirements, courts "must focus on the merits of the petition, except where requirements have been totally disregarded." RCW 71.05.010(2). This presumption in favor of deciding petitions based on their merits, "furthers both public and private interests because the mental and physical well-being of individuals as well as public safety may be implicated by the decision to release an individual and discontinue his or her treatment." RCW 71.05.010(2). If a total disregard of the ITA's requirements has occurred,

dismissal of the petition is required. *A.C.*, 1 Wn.3d at 744 (citing to *In re Det. of Swanson*, 115 Wn.2d 21, 31, 804 P.2d 1 (1990)).

Following the denial of a motion to revise a commissioner's ruling, we do not review the commissioner's decision but the superior court's ruling. *In re Det. of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021). And "[w]hen the superior court denies a motion to revise the commissioner's ruling, the commissioner's decision becomes the superior court's decision." *Id.*

Any interpretation of the ITA is a question of law we review de novo. *D.H.*, 1 Wn.3d at 774. We review the superior court's application of the law to disputed facts, including a trial court's ruling on a motion to dismiss based on an alleged ITA violation, for abuse of discretion. *Id.* The superior court abuses its discretion if its decision "is manifestly unreasonable or exercised on untenable ground[s] or for untenable reasons." *Id.*

B.    *LC Fails to Show that the Superior Court Abused its Discretion*

LC asserts that the hospital totally disregarded the ITA by detaining LC for seven weeks without legal authority after LC was medically cleared and the first DCR evaluation resulted in no detainment. Because of this, LC argues that the superior court erred in denying his motion to dismiss. The State responds that dismissal was not warranted because the ITA did not apply until LC was detained following the second DCR's evaluation.

The commissioner denied LC's motion to dismiss because it found that, prior to the 14-day petition, LC was held for the purposes of medical care and treatment, not for behavioral health treatment and, thus, LC's case "was not an ITA case." RP at 40. LC appears to assert that, because he was medically cleared prior to the first DCR evaluation and he was not detained after that evaluation, the hospital totally disregarded the ITA. However, while LC was medically

13

cleared, that did not mean that he did not need further treatment or that hospital staff's restraint of LC during his elopement events after the first DCR evaluation was not in response to his TBI as opposed to just his behavioral health disorder.

Medical clearance occurs when a physician or other health care provider has determined that a person is medically stable and ready for referral to the DCR or facility. RCW 71.05.020(38). Because of LC's severe cognitive impairment, discharge would have put his safety in jeopardy. Due to these concerns, LC's treatment team, including his medical team, determined that LC could not leave against medical advice. LC's surrogate decision maker, his sister, agreed.

Under RCW 7.70.065, health care providers may obtain informed consent "for health care" for an adult patient who lacks the capacity to make a health care decision from the adult siblings of a patient. RCW 7.70.065(1)(a)(vi). While a person of the age of consent is presumed to have capacity, a health care provider may conclude that a person lacks capacity if the health care provider:

> reasonably determines the person lacks capacity to make the health care decision due to the person's demonstrated inability to understand and appreciate the nature and consequences of a health condition, the proposed treatment, including the anticipated results, benefits, risks, and alternatives to the proposed treatment, including nontreatment, and reach an informed decision as a result of cognitive impairment; and the health care provider documents the basis for the determination in the medical record.

RCW 7.70.065(1). "Heath care," as used in RCW 7.70.065, includes any care provided to treat or maintain a patient's physical or mental condition. RCW 7.70.065(4); RCW 70.02.010(15).

Given the facts presented before the superior court, a court could have reasonably concluded that LC remained at the hospital for medical treatment as opposed to treatment of his

14

behavioral health disorder. Moreover, considering RCW 7.70.065, a court could have reasonably concluded that LC's sister's informed consent, in light of LC's incapacity, provided the hospital with a lawful basis, separate from the ITA, to continue treating LC at the hospital for non-behavioral health care.

LC relies on the Washington Supreme Court's decision in *A.C.*, 1 Wn.3d 731, in arguing that, when the first DCR evaluated but did not detain LC, the hospital lost any lawful authority to physically restrain or forcibly medicate LC. LC relies specifically on *A.C.*'s holding related to NG and CM. *See Id.* at 736, 745-46.

In *A.C.*, the court considered the involuntary detainment of NG and CM. *Id.* at 736. NG and CM were involuntarily detained for up to 180-days at Western State Hospital. *Id.* When NG and CM's court orders expired, the hospital held them for more than a month without seeking another court order for their detention. *Id.* When hospital staff realized that NG and CM's court orders had expired, "they started the ITA procedures over . . . as if the initial emergency procedures of the ITA applied." *Id.* at 737.

The court first considered the circumstances under which dismissal is warranted because of an ITA violation and held that a total disregard of the ITA occurs "when a person is involuntarily detained without legal authority under the act." *Id.* at 745. Turning to NG and CM's cases, the court concluded that the State totally disregarded the ITA when it held GN and CM for more than a month after the legal authority for their involuntary detention had expired. *Id.* at 746-47. Accordingly, the court held that their petitions should have been dismissed. *Id.* at 747.

The circumstances at issue in *A.C.* are distinct from those in LC's case. NG and CM entered Western State Hospital under involuntary detainment under the ITA. *Id.* at 735. The hospital then continued their detainment under the ITA after the original source of the hospital's lawful authority, the court orders, had expired. *Id.* at 737, 746. Here, LC entered the hospital's care as a medical patient for TBI. The hospital began to treat LC for those injuries, including with physical therapy and occupational therapy after he became alert. At some point, LC's sister became LC's surrogate decision-maker because he was unable to make decisions on his own.[5]

Subsequently, LC's sister agreed with LC's treatment team, which included his medical team, that leaving the hospital was not in LC's best interests despite LC being medically cleared. Because of the sister's consent to treatment on LC's behalf and in agreement with LC's medical treatment team, the hospital had grounds, distinct from the ITA, to prevent LC from leaving the hospital. And from the record before us, it appears that the hospital relied on those non-ITA grounds to continue treating LC during this time.

Moreover, LC points to no authority—nor is there an indication in the record—suggesting that LC's sister agreement to LC's continued treatment on his behalf constitutes an unlawful detention under the ITA. Nor does LC argue here or below that RCW 7.70.065(1) did not apply in his case. Instead, under the circumstance of LC's inability to make decisions on his own, the record indicated that his sister could consent to treatment on LC's behalf pursuant to RCW 7.70.065(1) and (1)(a). LC's failure to address this possible lawful basis in argument or authority defeats his argument that the superior court erred in finding that the hospital did not

---

[5] LC does not contend that the ITA had been violated prior to the first DCR's determination, and we do not decide that issue.

totally disregard the ITA. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."); *see also* RAP 10.3(a)(6).

Because LC fails to show that the superior court abused its discretion in finding that LC remained at the hospital for medical treatment and the hospital relied on non-ITA authority to continue to treat LC after the first DCR evaluation,[6] we hold that LC's argument fails.

## II. GRAVELY DISABLED FINDING

LC argues that the superior court's findings are insufficient to facilitate appellate review of the 14-day involuntary treatment order, specifically its findings supporting the conclusion that LC is gravely disabled. Alternatively, LC also argues that insufficient evidence supports the superior court's conclusion that LC, as a result of a behavior health disorder, is gravely disabled. We disagree.

A.      *Legal Principles*

The superior court may order a person to be detained for up to 14 days of involuntary treatment if the court finds (1) by a preponderance of the evidence that, as a result of a behavioral health disorder, the person either presents a likelihood of serious harm or is gravely disabled and (2) less restrictive alternatives are not in the best interests of the person or others. *In re Det. of E.S.*, 22 Wn. App. 2d 161, 176, 509 P.3d 871 (2022) (citing to RCW

---

[6] To be clear, we make no determination whether the hospital complied with certain procedures under the ITA that were not raised in this appeal.

71.05.240(4)(a)).  An individual is gravely disabled when, as a result of a behavioral health

disorder, the individual:

> (a) [i]s in danger of serious physical harm resulting from a failure to provide for his
> or her essential human needs of health or safety; or (b) manifests severe
> deterioration in routine functioning evidenced by repeated and escalating loss of
> cognitive or volitional control over his or her actions and is not receiving such care
> as is essential for his or her health or safety.

RCW 71.05.020(25).[7]  A "behavioral health disorder" is either a mental disorder, a substance use

disorder, or co-occurring mental and substance use disorders.  RCW 71.05.020(8).  A "mental

disorder" is "any organic, mental, or emotional impairment which has substantial adverse effects

on a person's cognitive or volitional functions."  RCW 71.05.020(39).

The petitioner bears the burden of proof by the preponderance of the evidence.  *Matter of*

*Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021) (citing to RCW 71.05.240(1), (4)).

"'Preponderance of the evidence means evidence that is more probably true than not true.'"  *In*

*re Pers. Restraint of Pugh*, 7 Wn. App. 2d 412, 422, 433 P.3d 872 (2019) (quoting *In re Welfare*

*of Sego*, 82 Wn.2d 736, 739 n.2, 513 P.2d 831 (1973)).

B.      *The Superior Court's Findings are Sufficient for Appellate Review*

LC contends that the superior court's "boilerplate findings" are insufficiently specific to

allow appellate review and that the findings violate the holding in *In re Det. of LaBelle*, 107

Wn.2d 196, 728 P.2d 138 (1986), which sets out requirements for findings in cases like LC's.

Br. of Appellant at 23.  We disagree.

---

[7] We cite to the current version of the law here because the substance of this subsection has not
changed between now and either the commissioner's or the superior court's consideration of the
14-day involuntary treatment petition.

The superior court must enter written findings of fact and conclusions of law after a probable cause hearing when it decides whether an individual should be involuntarily committed for 14 days. *A.F.*, 20 Wn. App. 2d at 123 (citing Mental Proceedings Rule 2.4(b)(4)). "Requiring written findings of fact and conclusions of law guarantees that the trial court has fully and properly dealt with the issues in the case as well as fully informed the parties and reviewing courts as to the basis of the court's decision." *Id.* (citing *LaBelle*, 107 Wn.2d at 218-20).

In *LaBelle*, the Washington Supreme Court considered the adequacy of the trial court's findings supporting its orders for 90-day and 180-day involuntary commitments. 107 Wn.2d at 218-20. The written findings supporting the trial court's conclusions appeared in a preprinted standardized form and merely recited the statutory grounds for involuntary commitment and a finding regarding the appropriateness of a less restrictive treatment as an alternative to detention. *Id.* at 218. The court agreed that such findings were inadequate because the findings' language was standardized and general, the findings did not indicate a factual basis for the trial court's conclusion that LaBelle was gravely disabled, and the findings did not indicate which statutory definition of "gravely disabled" the trial court relied. *Id.* at 219.

While the superior court here appears to have used a standardized form to record its written findings of fact, the content and specificity of the written findings of fact are distinguishable from those in *LaBelle*. Distinct from the written findings in *LaBelle*, the court here included facts specific to LC's case, including two-and-a-half pages summarizing Baker's testimony at trial, the arguments and outcome of LC's motion to dismiss, and LC's diagnosis as evidenced in both the petition and testimony. The superior court also expressly indicated—albeit through checkboxes—that it found LC to meet both statutory definitions of "gravely disabled."

The written findings here are distinctly more specific to LC's case and present some indication of the superior court's factual basis for its ultimate conclusions that LC qualified for involuntary treatment. *See Id.* at 218 ("While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions."). Accordingly, the superior court's written findings of fact here are adequate for appellate review.

Moreover, as the Court noted in *LaBelle*, even inadequate written findings may be supplemented by the court's oral ruling or statements in the record and, where no exceptions are taken below to the findings, "we will give them a liberal construction rather than overturn the judgment based thereon." *Id.* at 219. The superior court here expressly incorporated by reference its oral ruling into its written findings. In its oral ruling, the superior court made several statements regarding its factual basis for concluding that LC was gravely disabled. For example, the superior court noted that LC had severe, cognitive impairment, poor ability to make decisions, and poor reality perceptions. The superior court also stated that LC could not meet basic health and safety needs in the community and that, even in a hospital setting, LC's ability to meet these needs became difficult because of LC's agitation and impulsivity, among other behaviors. Even if we assumed the superior court's written findings were inadequate, examining liberally the entire record, including the superior court's oral ruling, it presents the factual basis for its conclusions.

C.      *Sufficient Evidence Supports the Superior Court's Finding the LC was Gravely Disabled as a Result of LC's Behavioral Health Disorder*

LC argues that the superior court's grave disability finding was not supported by sufficient evidence because there was no evidence that, as a result of his behavioral health disorder, LC was in serious danger of not meeting his essential needs or LC would not receive care essential to his safety. We disagree.

We review the superior court's decision on involuntary commitments to determine whether substantial evidence supports the superior court's findings of facts and whether the court's findings of facts support its conclusions of law and ultimate decision. *A.F.*, 20 Wn. App. 2d at 125. "'Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person' that the premise is true." *A.M.*, 17 Wn. App. 2d at 330 (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). When evaluating the sufficiency of the evidence, we consider the evidence in the light most favorable to the State. *Id*. Furthermore, we do not review a superior court's decisions on witness credibility or the persuasiveness of the evidence. *A.F.*, 20 Wn. App. 2d at 125.

Here, the superior court found, by a preponderance of the evidence, that LC met the statutory definition of "gravely disabled" under both prong (a) and prong (b) of RCW 71.05.020(25).

The superior court found that LC was gravely disabled under prong (a) by finding that LC was in danger of serious physical harm resulting from a failure to provide for his essential health and safety needs as a result of a behavioral health disorder. *See* RCW 71.05.020(25). This finding required evidence that LC failed or was "unable to provide for essential needs such

21

as 'food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded.'" *A.F.*, 20 Wn. App. 2d at 126 (quoting *LaBelle*, 107 Wn.2d at 204-205). *LaBelle* also described the required showing as one of "a *substantial risk* of danger of serious physical harm." *LaBelle*, 107 Wn.2d at 204 (emphasis added).

LC was diagnosed with multiple behavioral health disorders including a substance use disorder, alcohol use disorder, persistent encephalopathy, and a major neurocognitive disorder that mirrored severe dementia. LC does not assert that he did not have a behavioral health disorder.

The superior court very clearly found that LC's behaviors were symptoms of his major neurocognitive disorder. Baker testified that LC looked disheveled at times and had grooming help from his family. LC had no safe place to go to upon discharge. Baker estimated that, if LC were to leave the hospital, he would be brought back within a matter of hours and Baker worried that, while in the community unsupported, LC would inadvertently hurt someone or be a target due to his impulsivity. Further, LC did not always take his medications, such that there was an order in place for injectable medication if he declined to take certain medication. Baker found LC's perceptions of reality and his environment to be impaired and she believed that LC did not understand his life-long need for some level of treatment. Baker believed LC could learn ways to prompt himself to remember to do things like take his medicine. These facts demonstrated a high probability that due to LC's behavioral health conditions, he would face serious physical harm in the near future unless he received adequate treatment. Given these facts, a fair-minded

22

person could have concluded that LC would be in serious physical harm due to an inability to provide for his essential needs.

The superior court also found that LC was gravely disabled under prong (b) by finding that LC "manifest[ed] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his . . . actions and [was] not receiving such care as is essential for his . . . health or safety." CP at 25; *see* RCW 71.05.020(25). To support this finding, the petitioner had to show (1) "severe deterioration in routine functioning as evidenced by 'recent proof of significant loss of cognitive or volitional control,'" and (2) "'a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety.'" *A.M.*, 17 Wn. App. 2d at 335 (quoting *LaBelle*, 107 Wn.2d at 208). The petitioner also had to present evidence that, because of LC's severe deterioration of mental functioning, LC was unable to make rational decisions with respect to his need for treatment. *LaBelle*, 107 Wn.2d at 208 ("Implicit in the definition of gravely disabled under [prong (b)] is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.").

Baker testified that, since being admitted, LC had impaired perceptions of reality and his environment, an inconsistent memory, poor executive functioning and problem-solving skills, and inconsistent communication skills. Because of a lack of insight and judgment, Baker believed that LC could not manage his own health, safety, and wellbeing. Specifically related to volitional control, Baker noted that LC continued to attempt to leave the hospital despite being told he could not leave as it was not safe to and that he needed support. LC also presented with

23

unpredictable agitation which was a symptom of his major neurocognitive disorder. Hospital staff found they could not help LC manage his agitation due to LC not always being able to communicate the cause of the agitation and there being no clear precipitating event for his agitation.

Baker believed that LC did not understand his behaviors, the risk he posed to himself and others, or the fact that he would require some amount of care or assistance for the rest of his life. Moreover, Baker described multiple times when LC attempted to elope from the hospital and, when interrupted, would behave in a threatening manner to the extent where hospital staff called "code greys," worrying that LC could get assaultive. From these facts, a fair-minded person could have concluded the LC manifested severe deterioration in routine functioning through repeated and escalating loss of cognitive and volitional control and could not receive essential care if released.

As discussed above, according to Baker, LC's behaviors were consistent with his behavioral health diagnoses and these disorders caused LC to lack the insight and judgment needed to manage his own health, safety, and wellbeing, as well as caused LC to lack the memory to take his medications.

Viewing the evidence in the light most favorable to the State, a fair-minded person could have been persuaded that, more likely than not, LC was gravely disabled under both prongs as a result of a behavioral health disorder. Accordingly, substantial evidence supports the superior court's findings of grave disability.

No. 59937-6-II

CONCLUSION

We affirm the superior court's denial of LC's motion to revise the 14-day involuntary treatment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Che, J.

We concur:

_____
Glasgow, J.

_____
Cruser, C.J.

25